UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| D'ANZA JOHNSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   2:15-cv-01074-HNJ |
| | ) | |
| AT&T UMBRELLA BENEFIT PLAN | ) | |
| NO. 3, | ) | |
| | ) | |
| Defendant | ) | |

## <u>MEMORANDUM OPINION</u>

This action proceeds before the court on defendant's Motion for Summary Judgment.   (Doc. 29).   Plaintiff filed this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (ERISA), seeking short term disability and long term disability benefits under an employee welfare benefit plan provided by her employer, AT&T, Inc., through its AT&T Umbrella Benefit Plan No. 3.   Plaintiff asks the court to reverse defendant's adverse decision denying short term disability benefits. In addition, plaintiff asks the court to find her entitled to long term disability benefits, or in the alternative, remand the case for a further determination whether plaintiff is

1

entitled to long term disability benefits. For the reasons discussed herein, the court **GRANTS** defendant's motion.

The general principle of Rule 56, Federal Rules of Civil Procedure, that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," has limited application in an ERISA case because the district court "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.,* 2005 WL 894840, *7 (11th Cir. Mar. 16, 2005) (unpublished *per curiam* opinion) (quoting *Leahy v. Raytheon Co.,* 315 F.3d 11, 18 (1st Cir. 2002)). To that end, the Eleventh Circuit's six-step sequential framework for reviewing ERISA benefit denials guides the court:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision was "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether

2

"reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). The court undertakes the review by considering "the material available to the administrator at the time it made its decision." *Id.* Moreover, the claimant sustains the burden of proving entitlement to ERISA benefits. *Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1248 (11th Cir. 2008).

## FACTUAL BACKGROUND

### A.     The Benefits Plan

The AT&T Umbrella Benefit Plan No. 3 constitutes an employee welfare benefit plan regulated by ERISA, and the AT&T Southeast Disability Benefits Program functions as a component program of the Plan. (Doc. 15-2, Siegel Decl., ¶ 2). AT&T Services, Inc., serves as the Plan Administrator. (*Id.*, ¶ 3). Sedgwick Claims Management Services, Inc., (Sedgwick) serves as the third party Claims Administrator for the AT&T Southeast Disability Benefits Program. (*Id.*). As the Claims

3

Administrator, Sedgwick operates the AT&T Integrated Disability Service Center, and Sedgwick employees review and adjudicate all benefit claims submitted by Plan participants. (*Id.*).

The Plan provides as follows regarding the funding and contributions for the Southeast Disability Benefits Program:

> The Program is funded by a trust. Program costs are funded by periodic, nonreversionary Company contributions determined by the Program's actuaries for the purpose of funding Program benefits and maintaining appropriate reserves. Contributions are transferred to the Trust, which is established exclusively for approved Plan purposes. Benefits under the Program are paid or reimbursed by the Trust. Benefits paid in excess of IRS limits are funded by the general assets of your Participating Company. No benefits provided under the Program are provided by insurance.

(Doc. 15-3 at 36).

The Plan documents confer complete and exclusive discretionary authority to Sedgwick to finally and conclusively interpret and administer the terms of the AT&T Southeast Disability Benefits Program.[1] (Doc. 15-2, Siegel Decl., ¶ 4). Sedgwick

---

1 The Plan states:

> The Claims Administrator has been delegated the complete discretionary fiduciary responsibility for all disability determinations by the Plan Administrator to determine whether a particular Eligible Employee who has filed a claim for benefits is entitled to benefits under the Program, to determine whether a claim was properly decided, and to conclusively interpret the terms and provisions of the Program. Such determinations and interpretations shall be final and conclusive.

> The Plan Administrator (or, in matters delegated to third parties, the third-party that has been so delegated) will have sole discretion to interpret the Program, including, but

4

renders initial decisions on claims for benefits, as well as decisions on the appeals of benefit denials. (*Id.*). Neither the employees of AT&T nor any of its companies instruct Sedgwick to grant or deny benefits, nor do they provide any recommendations to grant or deny benefits in specific cases. (*Id.*). AT&T Services, Inc., the Plan Administrator, possesses no authority to reverse or alter Sedgwick's benefits determinations. (*Id.*).

The Plan defines "disability" as follows:

> You are considered Disabled for purposes of Short-Term Disability Benefits if the Claims Administrator, at its sole discretion, determines that you are Partially or Totally Disabled. You are considered Totally Disabled when, because of illness or injury, you are unable to perform all the essential functions of your job or another available job assigned by your Participating Company with the same full-time or part-time classification for which you are qualified. You are considered Partially Disabled when, because of illness or injury, you are unable to perform all of the essential functions of your job or another available job assigned by your Participating Company within the same full-time or part-time classification for which you are qualified, for the same number of hours that you were regularly scheduled to work before your Partial Disability.

> You are considered Disabled for purposes of Long-Term Disability Benefits when you have a continuous physical or mental illness or injury, whether work-related or non-work-related, that renders you unable to perform any type of work other than work for which the rate of pay is less

---

not limited to, interpretation of the terms of the Program, determinations of coverage and eligibility for benefits, and determination of all relevant factual matters. Any determination made by the Plan Administrator or any delegated third party will not be overturned unless it is determined to be arbitrary and capricious.

(Doc. 15-3 at 35).

than 50% of your Pay on the day immediately before your Short-Term Disability Benefits began. You may be eligible for Long-Term Disability Benefits payable if you are only capable of performing a job which pays less than 50 percent of your Pay before your Short-Term Disability Benefits started.

You are considered Disabled for purposes of Short-Term Disability Benefits if the Claims Administrator determines, at its sole discretion, that you are Totally or Partially Disabled. Disabled means that you have a medical condition supported by objective Medical Evidence.

You are considered Disabled for purposes of Long-Term Disability Benefits under this Program when you have a continuous physical or mental illness or injury, whether work-related or nonwork-related, that renders you unable to perform any type of work other than work for which the rate of pay is less than 50 percent of your Pay on the day immediately before your Short-Term Disability Benefits began.

(Doc. 15-3 at 6, 7, 11, 21).

With regard to "Medical Evidence," the Plan defines this term as follows:

Objective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator. Objective medical information includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession. In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability. For example, reports of intense pain, standing alone, will be unlikely to support a finding of Disability, but reports of intense pain associated with an observable medical condition that typically produces intense pain could be sufficient.

(*Id.* at 33).

## B.     Plaintiff's Claim

Plaintiff worked for AT&T as an accounting specialist.   Her duties consisted of conducting complex accounting and financial assignments, examining and analyzing data, and preparing reports, and the job comprised sedentary work.   (AR 58, 61, 215). Plaintiff participated in the AT&T Southeast Disability Benefits Program.   (Doc. 15-2, Siegel Decl., ¶ 3).

Plaintiff sought short term disability (STD) benefits for an absence beginning February 27, 2014.   (AR 001).[2]   Plaintiff alleged she was disabled due to chronic pelvic pain, pelvic floor myalgia, major depression, post-traumatic stress syndrome, psoriatic arthritis, fibromyalgia, kidney proteinuria, and interstitial cystitis.   (AR 59).   Sedgwick approved plaintiff's STD benefit claim, and after the seven-day waiting period, commenced paying STD benefits for the period from March 6, 2014, through May 15, 2014.   (AR 001, 201).   STD benefit payments ceased as of May 16, 2014.   (AR 201). Plaintiff appealed the cessation of benefits on May 29, 2014.   (AR 207).

As part of the first-level appeal, Sedgwick effected review of plaintiff's medical records by Dr. William Mazzella, board-certified in internal medicine (AR 246-49), Dr. Dennis Payne, board-certified in rheumatology and internal medicine (AR 256-59), and

---

[2] Citations to "AR" refer to the administrative record of plaintiff's claim, which constitutes Defendant's Exhibit A, found at Docs. 30-1 through 30-6.   For ease of reference, the court cites to the page number of the administrative record rather than to the page number of the CM/ECF paginated documents.

Dr. Tahir Tellioglu, a board-certified psychiatrist (AR 250-55). Plaintiff submitted additional medical records, and Sedgwick effected review of these records by Dr. Lyle Mitzner, board-certified in internal medicine and endocrinology (AR 306-09), as well as Drs. Mazzella (AR 311-14), Payne (AR 321-24), and Tellioglu (AR 316-20).

After consideration of the evidence from plaintiff's medical care providers, as well as the opinions of the independent medical consultants, the Plan Administrator upheld the denial of further benefits on December 5, 2014, finding no objective medical evidence to support a conclusion that plaintiff remained disabled beyond May 16, 2014. (AR 334).

On January 28, 2015, plaintiff appealed to the second level of review, based on the diagnoses of the afore-mentioned conditions. (AR 57-58, 340). As part of the second-level review, Sedgwick effected review of plaintiff's medical records by Dr. Robert J. Cooper, board-certified in endocrinology and internal medicine (AR 353-56); Dr. David Knapp, board-certified in rheumatology and endocrinology (AR 357-62; 371-76); Dr. Michael Rater, a board-certified psychiatrist (AR 364-68); and Dr. Jose Perez, Jr., board-certified in internal medicine (AR 386-91). Dr. Perez opined that plaintiff was disabled from May 16, 2014, through January 8, 2015, the last date for which there were available medical records. (AR 390).

Sedgwick then obtained more recent records, which it provided for review to Dr. Cooper (AR 438-39); Dr. Rater (AR 440-42); Dr. Rajendra Marwah, a board-certified rheumatologist (AR 444-46); and Dr. Perez (AR 434-36). Dr. Perez reaffirmed his opinion that plaintiff met the criteria for short term disability only through January 8, 2015. Sedgwick issued its final denial of plaintiff's STD claim on June 2, 2015, denying her claim for STD benefits from January 9, 2015, going forward. (AR 452-55). However, Sedgwick afforded Johnson STD benefits from May 16, 2014, to January 8, 2015 (AR 452, 547), presumably based upon Dr. Perez's cumulative assessment.

### C.    Plaintiff's Medical Evidence from Providers

Plaintiff provided medical records from her treating physicians. Dr. Stuart C. Tieszen, M.D., specializes in psychiatry and neurology.[3] Dr. Greg Eudy, M.D., specializes in rheumatology.[4] Dr. Alex Childs, M.D., specializes in obstetrics and gynecology.[5] She also submitted records from Dr. Edison Gonçalves, M.D., an endocrinologist (AR 267-69), and Dr. Joel Melvin, Ph.D., to whom Dr. Tieszen referred plaintiff for outpatient psychotherapy (AR 398-400, 425).

---

[3] The administrative record contains Dr. Tieszen's notes and opinions at AR 104-06, 159-200, and 402.

[4] The administrative record contains Dr. Eudy's notes and opinions at AR 230-37 and 410-24.

[5] The administrative record contains Dr. Childs' notes and opinions at AR 127-45 and 270-85.

**Dr. Stuart C. Tieszen**

Dr. Tieszen's notes of treatment begin on February 28, 2013.  (AR 199-200).
Plaintiff exhibited appropriate appearance and full affect, but with depression and
passive suicidality.  Plaintiff reported pain from psoriatic arthritis, which manifested
worse with cold and rainy weather.  (AR 199).  At a return visit on March 14, 2013, Dr.
Tieszen noted plaintiff's mood was depressed and anxious, but her cognition exhibited
within normal limits, and she exhibited no psychosis.  (AR 198).

Exam notes from March 28, 2013, contain plaintiff's report of continued trouble
sleeping.  Dr. Teiszen noted plaintiff appeared depressed and anxious, but she
exhibited appropriate appearance, full affect, cognition within normal limits, no suicidal
thoughts, and no psychosis.  (AR 197).  He prescribed medication to treat plaintiff's
symptoms of Attention Deficit Hyperactivity Disorder/Attention Deficit Disorder and
to help her sleep.  At the next visit on April 3, 2013, Dr. Tieszen noted plaintiff
exhibited an anxious mood due to "disappointments," but otherwise presented
normally.  He noted a plan to refer plaintiff for a sleep study and to Dr. Eudy for her
reports of psoriatic arthritis and pain.  (AR. 196).

On May 2, 2013, plaintiff reported to Dr. Tieszen she had a bad week, and he
described her mood as anxious.  However, he noted her appearance was appropriate,
and she exhibited full affect, no suicidal ideation or psychosis, and normal cognition and

concentration. (AR 195). On May 21, 2013, Dr. Tieszen's notes portrayed the same assessment as the prior visit, and plaintiff reported her medications worked well.

On September 10, 2013, Dr. Tieszen noted plaintiff's mood was "a little unstable" and plaintiff reported her attention was "all over the place." (AR. 193). She reported her mood was good, but her anxiety was variable and she was a worrier. Otherwise, Dr. Tieszen's assessment remained the same as the previous visit. The next notes from October 28, 2013, depict plaintiff was looking and feeling better. (AR. 184).

Dr. Tieszen's February 26, 2014, treatment notes record plaintiff appeared cooperative, well-groomed, logical, organized, alert, oriented, coherent, and with good insight and judgment, despite poor attention and a depressed and anxious mood. (AR 167, 180). Dr. Tieszen diagnosed her with post-traumatic stress disorder, anxiety, panic attacks, and depression. He noted she was non-compliant with medication absent frequent follow ups and recommended closer follow up and therapy. Dr. Tieszen admitted plaintiff to the hospital on March 13, 2014, and discharged her on March 22, 2014. (AR 163). At the time of admission, he diagnosed plaintiff with bipolar affective disorder type 2 with depression and suicidal ideation. In March 14, 2014, treatment notes, Dr. Tieszen noted past diagnoses of psoriatic arthritis, osteoarthritis, and mixed connective tissue disease.

By the time of her discharge on March 22, 2014, the suicidal ideation resolved, and she exhibited no psychosis, paranoia, or delusions. Her insight and judgment registered fair to good, and the panic attacks and anxiety had dissipated. He stated her chronic pain affected her mood. The discharge diagnoses on Axis I were bipolar affective disorder type 2 with depression, resolved PTSD, generalized anxiety, a history of panic attacks, mild agoraphobia, sleep disorder, and chronic pain disorder; Axis II diagnoses exhibited borderline personality disorder and adjustment disorder, and history of attention deficit disorder; and the Axis III diagnosis was chronic pain syndrome. Dr. Tieszen assessed plaintiff's GAF score as 60 upon discharge.[6]

Dr. Tieszen's notes from April 15, 2014, include a notation that plaintiff reported increased joint pain due to rapid weather changes. She registered logical and organized, and she exhibited normal and coherent speech, good insight and judgment, and slight anxiety secondary to corticosteroid medication. Dr. Tieszen noted no abnormality in plaintiff's gait. (AR 174). At plaintiff's next visit to Dr. Tieszen on May 13, 2014, he noted the same observations, additionally noting plaintiff no longer was taking corticosteroids or Humira. (AR 173).

---

[6] "GAF" refers to "global assessment of functioning." The DSM-IV-TR (2000) explains that GAF scores in the range of 51-60 indicate "moderate symptoms" from mental impairments and GAF scores in the range of 41-50 indicate "serious symptoms" from mental impairments.

On June 3, 2014, Dr. Tieszen sent a letter stating his and Dr. Eudy's opinion, after consultation, that plaintiff is and will remain indefinitely disabled, due to "rheumatological and physical disease, as well as mental illness." (Doc. 36-1 at 2).

**Dr. Greg Eudy**

Dr. Eudy submitted notes from May 8, 2014. (AR 234-37). Those notes indicated a prior visit on April 22, 2014, yet the record does not contain notes from that visit. He noted plaintiff had stopped taking certain medication which caused mouth thrush and increased pain, and increased stress from life situations. Dr. Eudy found tenderness in plaintiff's hands, wrists, knees, and ankles, swelling in plaintiff's metacarpal joints, and pain in her hip joints. (AR. 236). He diagnosed psoriatic arthritis under partial control with certain medication. However, due to cessation of the psoriatic arthritis medication, plaintiff experienced flares of intense inflammation. Dr. Eudy stated plaintiff's Sjogren's syndrome was stable and opined the diffuse pain and tenderness "likely represents [fibromyalgia]." (AR. 237).

At her next visit on May 22, 2014, plaintiff reported she still was not taking certain medication and reported "debilitating" back and neck pain and morning stiffness. (AR. 230). She also complained of persistent gastrointestinal discomfort which was better when she took medication. Dr. Eudy noted tenderness in plaintiff's

neck and back and pain in her hip joints. However, he noted no tenderness or swelling in her hands, knees, or ankles. (AR. 232).

On April 17, 2015, Dr. Eudy stated plaintiff reported multiple severe flares of pain and swelling in her neck, hips, knees, feet, hands, and elbows. Notes indicated a prior visit on January 15, 2015, yet the record does not contain those notes. (AR. 410). Dr. Eudy found tenderness in plaintiff's shoulders and knees, and pain in her neck and hips. (AR. 412). He noted certain medication poorly controlled her psoriatic arthritis, and treatment with other medications had failed. He also noted her depression was stable on treatment. (AR. 413).

**Dr. Joel Melvin**

Dr. Melvin saw plaintiff for individual psychotherapy on February 11, 2015. His notes indicate plaintiff last saw him on December 31, 2014. (AR 400). Plaintiff reported her living situation had been stressful. Dr. Melvin wrote plaintiff remained unstable, anxious, angry, depressed, and agitated, with limited insight and impulsivity in judgment. However, plaintiff was cooperative and engaging, and she exhibited normal speech and good eye contact, tangential thought process, no disturbance in perception, and awareness of current events and past history. (AR 400). Plaintiff failed to appear for her next appointments on March 11, 2015, and March 25, 2015. (AR 398-99).

Dr. Melvin's April 22, 2015, notes list diagnoses of PTSD, major depressive disorder, and borderline personality disorder. (AR 425). Dr. Melvin noted plaintiff presented as anxious, agitated, depressed, and feeling overwhelmed. She exhibited psychomotor agitation, soft speech, illogical thought process, impairment to recent memory, poor judgment and insight, and some suicidal ideation. However, she was cooperative, engaging, aware, and she had fair attention and concentration.

### D.    The Medical Evidence from Independent Examiners

### Dr. Robert Cooper

Dr. Robert J. Cooper, M.D., specializes in endocrinology. He reviewed all medical records submitted by plaintiff's medical care providers, as well as the description of plaintiff's job duties. Dr. Cooper noted plaintiff saw Dr. Edison Gonçalves for evaluation of an adrenal mass, and on May 15, 2014, Dr. Gonçalves opined plaintiff's CT scan suggested an adenoma which had increased in size since 2006. However, Dr. Gonçalves wrote on June 2, 2014, that a hormonal workup was negative, and thus, he found surgery unnecessary and elected observation. (AR 267). Dr. Cooper concluded the clinical findings do not support a finding of inability to work related to adrenal adenoma, endocrinology, or metabolism from May 16, 2014, through the date of his report on February 20, 2015. He found no evidence of hormonal

secretion from the adrenal adenoma or malignancy, such that plaintiff would be unable to perform her regular unrestricted job.   (AR 350-56).

In a second review dated May 6, 2015, Dr. Cooper stated he examined medical records dated 2014 and 2015, in addition to the Social Security disability award. Neither the Social Security notification nor plaintiff's medical examination notes contained any medical information pertaining to plaintiff's endocrine issues or the adrenal adenoma.   Therefore, from an endocrinology, diabetes, and metabolism standpoint, Dr. Cooper found nothing to warrant altering his opinion that plaintiff was not disabled from performing her regular unrestricted job as of May 16, 2014.   (AR 437-38).

**Dr. William Mazzella**

Dr. Mazzella noted plaintiff's history of psoriatic arthritis, myalgia, joint pain, adrenal adenoma, and depression.   He reviewed plaintiff's job description and noted no specific physical requirements other than the routine use of a computer in an office environment.   (AR 247).   Dr. Mazzella noted plaintiff's hospitalization from March 13 to March 22, 2014, secondary to bipolar affective disorder with depression and suicidal ideation; her surgery on April 16, 2014, for cystoscopy, injection of pelvic floor muscles, excision, and lysis of adhesions; post-operative visits to Dr. Childs in April 2014 depicting well-healing incisions and antibiotic prescriptions; and her visit to Dr. Eudy

on May 23, 2014, when Dr. Eudy noted tenderness to palpation of the neck and hips. (AR 247-48). Dr. Mazzella found no disability sufficient to prevent plaintiff from returning to work. He saw no specific physical exam findings to support functional impairments that would require medically appropriate restrictions regarding plaintiff's normal occupation. Plaintiff exhibited normal blood pressure and blood test results, and despite her numerous diagnoses, Dr. Mazella stated the clinical documentation identified no "specific clinical findings either on physical exam or by diagnostic testing that would support functional impairments for this claimant that would reasonably prevent the claimant from performing her normal occupation" from May 16, 2014, forward. (AR 248). Dr. Mazella noted plaintiff's psychological symptoms yet deferred any opinion on those conditions to a psychiatrist or psychologist.

In a follow up evaluation dated November 7, 2014, Dr. Mazzella stated he reviewed additional medical records regarding plaintiff's treatment by Dr. Childs and Dr. Gonçalves, and he spoke with Dr. Childs. Dr. Childs' last examination of plaintiff occurred May 12, 2014, at which time she was "doing fine from a postop perspective." (AR 311). Plaintiff canceled her May 28, 2014, appointment with Dr. Childs because she felt well and did not need to see him. Dr. Mazzella also reviewed Dr. Gonçalves' notes about her consult regarding the adrenal adenoma, which had no effect on plaintiff's hormone levels and did not require surgery. Dr. Mazzella remarked the

additional information did not change his previous opinion that plaintiff is not disabled from an internal medicine perspective. (AR 313).

**Dr. Lyle Mitzner**

Dr. Mitzner submitted an evaluation on November 7, 2014. (AR 305-09). He reviewed notes by Dr. Childs, Dr. Eudy, and Dr. Tieszen from May and June, 2014. From an endocrinology perspective, Dr. Mitzner noted the increase in the size of plaintiff's adrenal adenoma from 2006 to 2014, yet also noted the lack of hormonal changes or symptoms from the adenoma. Therefore, he concluded plaintiff was not disabled due to any endocrine system issues.

**Dr. Tahir Tellioglu**

Dr. Tellioglu reviewed the records of plaintiff's treatment by Dr. Tieszen from 2013 and 2014, to the extent he found the notes legible. Her mental status exams during 2013 generally displayed appropriate appearance, depressed mood, full affect, no psychosis, passive suicidal ideation, and cognition and concentration within normal limits or checked for "other." On May 2, 2013, plaintiff displayed euthymic mood with full affect, and cognition and concentration unchanged. On September 10, 2013, plaintiff exhibited a slightly unstable mood, and Dr. Tieszen diagnosed her with ADHD. On February 26, 2014, plaintiff maintained good eye contact and had normal speech and motor activity, but with a depressed mood and congruent anxious affect.

However, plaintiff registered logical, goal-directed, fully alert with intact memory but poor attention, and demonstrated good insight and judgment. (AR 251).

In Dr. Tellioglu's further review, he found that Dr. Tieszen's March 17, 2014, notes reflect plaintiff's cognitive functioning was within normal limits with 15 to 30 minutes of focus and concentration. Plaintiff expressed her current circumstances and responded to direct questions appropriately. However, plaintiff experienced impaired reasoning and judgment due to depression, anxiety, and suicidal ideation; however, she had no delusional ideation or hallucinations. Dr. Tellioglu further found that Dr. Tieszen described plaintiff as depressed, panicked, tearful, and unable to compose herself. Plaintiff reported panic attacks while in the hospital, and exhibited a sad, depressed, flat, and blunted affect. While plaintiff presented with appropriate grooming, her speech was soft and she reported suicidal ideation with a plan. Plaintiff also showed weight gain, change in appetite, sleep problems, nightmares, and socialization problems. Plaintiff reported being unable to shop, clean house, pay bills, or drive. Her records showed diagnoses of major depressive disorder and PTSD, with a GAF of 20 upon hospitalization and 70 prior to discharge. As of March 17, 2014, Dr. Tieszen found plaintiff unable to return to work, yet her projected return to work was three to four weeks. (AR 251-52).

Dr. Tellioglu reviewed notes from plaintiff's March 2014 hospitalization, specifically Dr. Tieszen's discharge notes from March 22, 2014. Dr. Tieszen admitted plaintiff with bipolar disorder, type 2, with depression and suicidal ideation, after several stressors and deterioration despite outpatient treatment. By the time of her discharge, she did not exhibit suicidal ideation, psychosis, paranoia, or delusions, and her insight and judgment were fair to good. She reported no panic or anxiety, though pain affected her mood to some extent. Her discharge diagnoses on Axis 1 were bipolar disorder type 2 with depression, history of resolved PTSD secondary to abuse, generalized anxiety disorder, history of panic attacks, mild agoraphobic features, sleep disorder, chronic pain disorder; on Axis 2, borderline personality disorder, adjustment disorder, and history of ADD; on Axis 3, chronic pain syndrome disorder; and Axis 4 was moderate with a GAF improved to 60. (AR 252).

April 15, 2014, progress notes demonstrated plaintiff had good eye contact, normal speech and motor activity, congruent anxious affect, logical and goal-directed thought pattern, and no suicidal ideation. Plaintiff registered fully alert, with intact memory, good insight and judgment, yet poor attention. She reported compliance with her medication, less sleep, and more eating. On May 13, 2014, Dr. Tieszen listed plaintiff's diagnoses as panic disorder, generalized anxiety disorder, and bipolar disorder. Plaintiff displayed good eye contact, normal speech and motor activity, blank

mood and congruent anxious affect, poor attention, logical and goal-directed thought pattern, and no suicidal ideation. She also exhibited full alertness, intact memory, good insight, and good judgment.

Dr. Tellioglu found plaintiff not disabled based on the lack of follow up notes supporting any ongoing, severe psychiatric disabling condition after May 16, 2014. Dr. Tieszen's letter of June 3, 2014, contained no details about plaintiff's condition. While plaintiff suffered from mood and anxiety conditions prior to May 16, 2014, the progress notes from May 13, 2014, portrayed less severe symptoms. Dr. Tellioglu noted Dr. Tieszen's letter failed to elaborate on the extent of plaintiff's symptoms and the impact of any symptoms on her work functioning, and the record contained no exam notes after May 13, 2014, describing plaintiff's condition. (AR 254).

**Dr. David Knapp**

Dr. David S. Knapp, M.D., specializes in rheumatology. After reviewing plaintiff's medical records related to her psoriatic arthritis, Dr. Knapp found no reports of clinically significant joint swelling, tenderness, limitation of motion, weakness, or deformity that would prevent plaintiff from performing her usual job duties. (AR 357-62). Plaintiff's records documented an increase in arthritis pain upon discontinuation of immunosuppressive therapy after April 16, 2014, gynecological surgery; however, the records depicted no rheumatology care after May 8, 2014, and

plaintiff's physicians released her to full duties after surgery as of May 16, 2014. Plaintiff's records displayed tenderness and swelling of the small joints in the hands, and tenderness in the hips and knees; however, the records contained no documentation of fibromyalgia tender points. Dr. Knapp also noted plaintiff's history of chronic pain associated with pelvic floor myalgia that was treated with injections, and irritable bowel syndrome with chronic abdominal complaints and diarrhea partially responsive to discontinuation of a medication. Dr. Knapp remarked that May 8, 2014, examination notes reflected plaintiff was in no distress. Any flare ups of joint and tissue pain resulted from plaintiff's discontinuation of Humira due to surgery. At plaintiff's May 15, 2014, visit to Dr. Gonçalves, he noted plaintiff was ambulatory with no rashes, and his examination was otherwise unremarkable.

Dr. Knapp also found Dr. Childs released plaintiff to full duty on May 16, 2014, after resolution of a surgical hematoma. Dr. Knapp also reviewed Dr. Mazzella's notes from November 7, 2014. These notes documented a discussion with Dr. Childs in which Dr. Childs indicated a good post-operative recovery and that plaintiff did not attend a follow-up appointment on May 28, 2014, because she "felt fine." (AR 360). Dr. Knapp found the following physical limitations: tenderness and swelling of metacarpal joints; tenderness in knees, hips, and ankles without documentation of limitation of motion, deformity, weakness, or other functional impairment due to

psoriatic arthritis; and no documentation of fibromyalgia tender points.  (AR 361).

With regard to plaintiff's history of chronic pain and fibromyalgia, Dr. Knapp found

plaintiff's voiced complaints "out of proportion to the measurable medical,

rheumatological, neurologic or orthopedic pathology documented."  (AR 362).   He

opined the records failed to document measurable pathology evidenced by diagnostic

tests, physical examinations, functional assessments, imaging, or laboratory findings.

(*Id.*).   Dr. Knapp submitted a revised report on February 24, 2015, but his findings

remained the same.   (AR 371-76).

### Dr. Michael Rater

Dr. Michael A. Rater, M.D., the psychiatrist consultant, considered plaintiff's

claims of disability based on major depression and PTSD.   He noted plaintiff

experienced personal life problems, and mental health issues requiring partial

hospitalization and inpatient hospitalization in March 2014, followed by outpatient

care.   Dr. Rater noted Dr. Tieszen's April 15, 2014, examination portrayed all areas of

mental status within normal limits apart from variable mood and agitation secondary to

steroid medication.   On May 13, 2014, plaintiff experienced surgical complications, yet

all areas of plaintiff's mental status fell within normal limits except for anxious affect.

Dr. Rater faults Dr. Tieszen's June 2014 opinion as to plaintiff's disability for lack of

support by mental status findings or subjective complaints, and a lack of records after

June 2014. Dr. Rater found no subjective complaints, objective findings on examination, or discussions of impairments in her activities of daily living sufficiently indicating a mental condition limiting or restricting plaintiff's ability to work after May 16, 2014. (AR 365-68).

Dr. Rater submitted a second opinion on May 6, 2015. (AR 440-42). He reviewed additional examination notes from Dr. Tieszen, Dr. Eudy, and Dr. Melvin. Dr. Rater confirmed his original opinion that plaintiff is not disabled, focusing on her ability to live independently and care for her ill son, as well as Dr. Tieszen's March 30, 2015, notes that plaintiff had no problems with composure or cognition. Dr. Rater remarked that the Social Security disability award did not impact his review because the forms did not indicate why plaintiff was awarded disability benefits. Dr. Melvin found issues with plaintiff's judgment and cognition, and Dr. Rater acknowledged the records support plaintiff's claim of psychological problems for which she seeks treatment. However, her ability to live independently and care for her son negated a lack of work capacity.

**Dr. Jose Perez**

Dr. Jose A. Perez, Jr., M.D., reviewed all information to determine whether plaintiff's conditions, cumulatively, disabled her from performing her regular job duties. He concluded in a report dated March 25, 2015, that plaintiff indeed was disabled from

the alleged date of onset through January 8, 2015. (AR 386-90). He relied on plaintiff's "complex psychiatric history with evidence of inflammatory arthritis . . . subject to flares" as well as her "complicated pelvic pain problem with complications after surgery." He concluded it was "unclear that the psychiatric issues and rheumatologic issues are under control per the notes from Drs. Tieszen and Eudy." (AR 389). He found it reasonable to reevaluate within six months from her last documented visit on June 8, 2014, but he opined plaintiff failed to show inability to work after January 8, 2015, without further documentation.

In a May 6, 2015, supplemental report, Dr. Perez remarked that he reviewed plaintiff's medical records from Dr. Eudy, Dr. Melvin, and Dr. Tieszen, as well as laboratory reports, with the latest record date as April 2015. (AR 434-36). Dr. Perez also reviewed plaintiff's favorable Social Security determination but stated it did not impact his review due to the lack of explanation for the agency's determination plaintiff was disabled. Plaintiff's January 15 and April 17, 2015, follow up examinations with Dr. Eudy revealed no active swelling or disease upon examination which would require follow up less than every three months. Dr. Eudy noted only tenderness and pain on range of motion but no apparent distress. Dr. Perez reiterated his earlier finding that plaintiff was disabled only through January 8, 2015.

### Dr. Rajendra Marwah

Dr. Marwah noted plaintiff exhibited diffuse aches and pains affecting her neck, lower back, hips, and shoulders, as well as some swelling over the metacarpophalangeal joints. However, Dr. Marwah found no documentation in Dr. Eudy's notes about handgrip strength and found no evidence of muscle weakness, synovitis, involvement of other joints, decreased range of motion, radiculopathy, or focal neurological signs. Despite a diagnosis of fibromyalgia, Dr. Marwah noted the lack of documentation of tender points. (AR 444). He also found no radiologic studies of plaintiff's hands, feet, or other joints. He also noted plaintiff's attending physician released her to return to full-time work after surgery on May 15, 2014. Dr. Marwah agreed with Dr. Knapp that plaintiff's psoriatic arthritis would not prevent her from performing her job or any similar job on a full-time basis without any objective functional restrictions or limitations. (AR. 445).

### Dr. Dennis Payne

Dr. Payne first submitted an opinion on July 22, 2014. (AR 256-59). He reviewed Dr. Tieszen's records but found them mostly illegible. (AR 257). He also reviewed Dr. Eudy's notes from April 22, 2014, when plaintiff saw him for psoriatic arthritis and Sjogren's syndrome. She experienced an increase in pain due to cessation of certain medication after surgery. Dr. Eudy noted tenderness and swelling in the

metacarpophalangeal joints, and tenderness in wrists, knees, and ankles. His notes included plaintiff's reports of "flares of intense inflammation" and ongoing active disease. Dr. Eudy's May 8, 2014, notes include the same diagnoses, along with plaintiff's reports of debilitating back and neck pain with stiffness. Dr. Eudy found tenderness and pain in the hips and low back. Plaintiff failed to respond to treatment with certain medication. Dr. Payne concluded the findings did not support a degree of impairment that would limit plaintiff's ability to perform her job as an account specialist from May 16, 2014, forward. (AR 258).

Dr. Payne submitted a supplemental review on November 7, 2014. He noted plaintiff's multiple gastrointestinal complaints and a colonoscopy consistent with irritable bowel syndrome. He also reviewed Dr. Childs' April 16, 2014, surgical notes regarding chronic pelvic pain, involving cystoscopy, excision of possible pelvic endometriosis (the biopsy was negative for endometriosis), and injection of the pelvic floor muscles with lysis of adhesions. At the follow up appointments with Dr. Childs, plaintiff reported continued pelvic pain and urinary complaints, yet Dr. Childs noted minimal lower left quadrant pain and well-healed surgery wounds upon examination. (AR 322). Dr. Payne considered Dr. Eudy's April 22, 2014, notes, in which he mentioned plaintiff had stopped taking arthritis medication prior to surgery and experienced tenderness and swelling in her hands, and tenderness in her wrists, hands,

knees, and ankles. Dr. Eudy noted "flares of intense inflammation" and ongoing active disease. At the next visit on May 8, 2014, plaintiff complained of debilitating back and neck pain with stiffness, and the examination noted pain in the hips and low back. However, he found "no laboratory or imaging data that support a degree of disease that is impairing." (AR 323). Dr. Payne concluded the additional notes did not change his opinion that, from a rheumatology perspective, plaintiff was not disabled from her regular job as of May 16, 2014.

## DISCUSSION

### A. The Court Agrees with the Administrator's Decision Upon *De Novo* and Discretionary Review

As set forth previously, in the first step of the analysis the court must "review the administrator's decision *de novo* for correctness: based on the evidence before the administrator at the time it made its decision, the court evaluates whether it would have reached the same decision." *Melech v. Life Ins. Co. of N. Am.,* 739 F.3d 663, 673 (11th Cir. 2014). However, the plaintiff conceded that the Plan afforded the defendant complete discretion in its benefits determinations. Therefore, the court may review the defendant's decision pursuant to the arbitrary and capricious standard, that is, whether

the decision rests upon "reasonable" grounds.[7]   The undersigned determines that the defendant's decision passes muster under either review standard.

As the foregoing factual review establishes, the Plan defined the term disabled as the inability "to perform all the essential functions of [the participant's] job or another available job . . . with the same full-time or part-time classification . . . ."   Initially, the defendant deemed plaintiff suffered a disability from an onset date of February 27, 2014, to May 15, 2014, and it conferred short-term disability benefits pursuant to that determination.   Plaintiff's appeal to secure further STD benefits post-May 15, 2014, occasioned the review by several physician advisors of plaintiff's medical records, and their review resulted in the December 5, 2014, appeal determination that plaintiff did not suffer an STD from May 16, 2014, forward.   Critically, however, the physicians limited their review to their respective specialties, and each of them deemed the plaintiff not disabled from their discipline's perspective.

Upon plaintiff's second appeal, the defendant tasked Dr. Perez, an internal medicine specialist, to determine whether plaintiff's cumulative ailments rendered her disabled pursuant to the Plan's criteria.   Dr. Perez's initial review on March 25, 2015, concluded that plaintiff was disabled for the additional period of May 16, 2014, to January 8, 2015.   As the record evidence establishes, Dr. Perez's conclusion afforded

---

[7] "In ERISA cases, the phrases 'arbitrary and capricious' and 'abuse of discretion' are used interchangeably." *Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 n.5 (11th Cir. 2011).

plaintiff extended STD benefits for this additional period: May 16, 2014, through January 8, 2015.

However, Dr. Perez concluded that plaintiff would need to submit further medical documentation establishing the inability to work after January 8, 2015. Therewith, Dr. Perez issued another opinion on May 6, 2015, after reviewing plaintiff's treating physicians' records dated January 15, 2015, and April 17, 2015. In addition, Dr. Perez reviewed notes from plaintiff's psychiatrists, which were difficult to read yet indicated depression and medication changes. After his review, Dr. Perez concluded that the post-January 8, 2015, records portrayed psoriatic arthritis without active swelling and tenderness and pain upon range-of-motion manipulation; yet, her condition only required examinations every three months. Therefore, Dr. Perez did not change his previous determination that the plaintiff was not disabled from January 9, 2015, forward, and the defendant decided the appeal accordingly.

The other physician advisors who reviewed post-January 8, 2015, medical records did not find a disabling condition either. Dr. Cooper, the endocrinologist, found no post-January 8, 2015, evidence of endocrinological issues related to plaintiff's adrenal adenoma. Dr. Marwah, a rheumatologist, reviewed the post-January 8, 2015, evidence and found no functional limitations or restrictions attendant to her aches, pains, fatigue, and possible fibromyalgia. Dr. Rater, a psychiatrist, reviewed

post-January 8, 2015, evidence and noted that her treating psychiatrist found no problems with composure, cognition, or plaintiff's ability to care for her son.

As reviewed, the defendant's physician advisors – who each specialized in different disciplines – did not deem defendant disabled upon reviewing her medical records during the first and second appeal. They each reviewed plaintiff's treating physicians' records, and they determined that from the perspective of their discipline plaintiff's particular condition – that fell within their particular specialty – was not disabling. Dr. Perez, an internal medicine specialist who reviewed all of plaintiff's conditions cumulatively, revised defendant's assessment to find that plaintiff was disabled from May 15, 2014, to January 8, 2015. Yet, the post-January 8, 2015, medical evidence does not cumulatively indicate the presence of a disability, and the other physician advisors' review of those records reached the same conclusion as to each condition within their respective specialties.

The undersigned does not find that the defendant was wrong in its STD determination, and it definitely issued a reasonable decision pursuant to the arbitrary and capricious standard. The defendant extended plaintiff's STD benefits for an additional seven months after the second appeal due to Dr. Perez's conclusions. It declined to do so for any additional period due to Dr. Perez's determination that the medical records did not demonstrate a cumulative disability post-January 8, 2015. The

defendant decided correctly when its second appeal resulted in an additional period of STD benefits, and it decided correctly when it relied upon the same opinions to deny STD benefits beyond the extension. And even if the undersigned errs in this *de novo* consideration of defendant's decision, the defendant issued a reasonable decision upon the second appeal given the sequence of evidence reviewed herein.

Plaintiff argues that Sedgwick's benefits decision was arbitrary and capricious because relying upon the claims reviewers' reports and "totally disregarding the reports of plaintiff's treating physicians" constituted procedural unreasonableness, and "failing to credit the evidence and problems with the [physician advisors'] reviews" represented substantive unreasonableness. Plaintiff's arguments fail in these regards.

As an initial matter, ERISA appeals do not afford any special deference to the opinions of treating physicians over other types of evidence. *Black & Decker v. Nord*, 538 U.S. 822, 825 (2003); *Doyle v. Liberty Life Assur. Co. of Boston*, 542 F.3d 1352, 1358 (11th Cir. 2008). Furthermore, as discussed at length the physician advisors exhaustively reviewed the treating physician's records in reaching their conclusions. Indeed, Dr. Perez reviewed the treating physicians' records and concluded that plaintiff's cumulative conditions extended her period of STD, which Sedgwick adopted. Therefore, the defendant did not "totally disregard" the treating physicians' reports. As for a purported failure to "credit" the record evidence and examine problems with

the physician advisors' conclusions, the defendant did not act unreasonably in its consideration of the treating physicians' or physician advisors' reviews, as recounted previously.

Plaintiff also faults the defendant for disregarding the Social Security Administration's decision to award plaintiff disability benefits.[8] However, the provision of Social Security disability benefits does not dispositively affect an ERISA plan's disability determination, *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999); *Ray v. Sun Life & Health Ins. Co.*, 443 Fed.Appx. 529, 533 (11th Cir. 2011), and a court accords the SSA's determination no particular deference or weight. *Nord*, 538 U.S. at 834.[9] Indeed, the presumptions embodied in the SSA's five-step, disability determination "inevitably simplify, eliminating consideration of many differences potentially relevant to an individual's ability to perform a particular job." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 801, 804 (1999). "Hence, an individual might

---

[8] The Social Security Administration determined plaintiff is disabled in or about September 2014. (Doc. 36-1 at 4-5).

[9] The lack of deference rests on several reasons. First, the standards and procedures the SSA employs in determining eligibility for disability benefits under the Social Security Act are distinct and may differ considerably from those used to determine whether a claimant is entitled to disability benefits under the terms of an ERISA plan. *See Nord*, 538 U.S. at 832-33; *Krolnik v. Prudential Ins. Co. of Amer.*, 570 F.3d 841, 844 (7th Cir. 2009); *Paese v. Hartford Life & Acc. Ins. Co.*, 449 F.3d 435, 442-43 (2d Cir. 2006); *Smith v. Continental Cas. Co.*, 369 F.3d 412, 419-20 (4th Cir. 2004). Likewise, the ERISA plan administrator may have considered more recent or different information or weighed evidence differently. *See Ray*, 443 Fed.Appx. at 533; *Schexnayder*, 600 F.3d at 471; *Wade v. Aetna Life Ins. Co.*, 684 F.3d 1360, 1362-63 (8th Cir. 2012).

qualify for [disability benefits] under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'performing the essential functions' of her job."   *Id.* (internal alteration omitted).

To wit, the SSA test categorizes as disabled one who cannot perform "substantial gainful activity."   The Plan defines "disability" as inability to "perform all the essential functions of your job or another available job . . . with the same full-time or part-time classification for which you are qualified."   Furthermore, although a court must give special weight to the opinions of a claimant's treating physician in social security cases, the same deference does not apply to disability determinations under employee benefit plans governed by ERISA.   *Nord*, 538 U.S. 822 at 825.

In any event, this case does not permit a proper comparison of the SSA's determination with the defendant's conclusions.   The record evidence merely provides that the SSA awarded monthly benefits in an enumerated amount.   The record does not contain an Administrative Law Judge's opinion or other documentation elucidating the SSA's rationale for finding plaintiff disabled.   Thus, the evidence that the SSA awarded plaintiff disability benefits merits limited probative value as it relates to plaintiff's eligibility for STD benefits under the Plan.   *Cf. Shaw v. Connecticut Gen. Life Ins. Co.*, 353 F.3d 1276, 1280 n.2, 1281, 1286 (11th Cir. 2003) (the Eleventh Circuit noted, in holding that the district court improperly relied upon an SSA determination to award

ERISA benefits, that "[b]esides a letter from the [SSA] confirming that Shaw had been approved for Social Security benefits, no documentation (particularly documentation indicating the basis upon which the approval was granted) from the [SSA] has been entered into the record."); *Ianniello v. Hartford Life & Acc. Ins. Co.*, 508 Fed.Appx. 17, 21 (2d Cir. 2013) ("In this case the SSA award bears even less on whether Hartford abused its discretion, because the only document Ianniello provided Hartford was a letter from the SSA confirming the amount of disability benefits she received each month. Ianniello has identified no documents that reveal the basis for the SSA's determination.").

Finally, plaintiff complains that the defendant operated under a conflict of interest because AT&T contributes variable sums to the trust if claims exceed the trust's fund balance. If a claim administrator operates under a conflict of interest, a district court may consider the "factor when determining whether an administrator's decision was arbitrary and capricious." *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1197 (11th Cir. 2010). As an initial matter, plaintiff's entreaty fails. No conflict of interest exists when a plan pays its claims benefits out of a non-reversionary trust instead of from a contributing enterprise's own assets. *Gilley v. Monsanto Co., Inc.*, 490 F.3d 848, 856-57 (11th Cir. 2007); *Jones v. Connecticut Gen. Life Ins. Co.*, 2009 WL 10667628 (S.D. Fla. May 13, 2009); *Dunlap v. BellSouth Telecommc'ns, Inc.*, 431 F.Supp.2d 1210, 1281 (M.D. Ala.

2006). The plan in this case falls within the ambit of the above-cited cases because it pays benefits from a trust funded through the employer's non-reversionary contributions. Thus, the law commands that no conflict of interest exists.

Furthermore, the evidence plaintiff primarily relies upon to demonstrate a conflict of interest emanates from another case's deposition transcript from 2001, and hearing testimony from cases litigated in 2004. In any event, even if there exists a conflict of interest, it does not alter the previous review finding that Sedgwick – which was the Claims Administrator, not the Plan Administrator – did not err in its final determination on plaintiff's claims for STD benefits.

## B. There is No Basis for the Claim for Long Term Disability Benefits

As alternative relief, plaintiff asks the court to award long term disability (LTD) benefits or remand to the Administrator for a determination of eligibility for LTD benefits. The Plan requires a participant to exhaust a 52-week waiting period during which she receives STD benefits before achieving eligibility for LTD benefits. (Doc. 15-3 at 22). Plaintiff received STD benefits for a 44-week period from March 6, 2014, to January 8, 2015; thus, she fails to satisfy the Plan's prerequisite that she receive 52 weeks of STD benefits before claiming any eligibility for LTD benefits. Because plaintiff fails to succeed on her claim for STD benefits beyond January 8, 2015, any remand would constitute a "useless formality." *Leggett v. Provident Life & Accident Ins.*

*Co.*, 2004 WL 291223, at *48 n.18 (M.D. Fla. Feb. 9, 2004); *see also Gentle v. Kohler Co.*, 966 F.Supp.2d 1276, 1292-94 (N.D. Ala. 2013) (remand for consideration of LTD benefits claim, after denial of STD benefits by employer, not required when plaintiff fails to demonstrate defendant would have declined to consider LTD benefits claim, as opposed to denying the claim); *Leggett*, 2004 WL 291223, at *46-48 (remand futile when benefits plan contains time limit for seeking LTD benefits, which has expired). Furthermore, plaintiff has not exhausted her administrative remedies with regard to her claim for LTD benefits. Binding case law in this circuit holds that a plaintiff must exhaust administrative remedies before suing under an ERISA plan. *Byrd v. MacPapers, Inc.*, 961 F.2d 157, 160 (11th Cir. 1992); *Mason v. Continental Grp., Inc.*, 763 F.2d 1219, 1227 (11th Cir.1985), *cert. denied*, 474 U.S. 1087 (1986).

## CONCLUSION

Based on the foregoing analysis, the court **GRANTS** defendant's motion for summary judgment and **DISMISSES** this action with prejudice. The court will enter a separate final judgment in accordance with this Memorandum Opinion.

DONE and ORDERED this 9th day of January, 2018.

_____

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE

37